IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

DONAVAN E. DANIEL,

     Petitioner,

vs.                      No. 05-2273-JPM/dkv

TONY PARKER,

     Respondent.

---

ORDER DENYING HABEAS PETITION
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

On April 13, 2005, Petitioner Donavan Daniel, who is confined at the West Tennessee State Prison ("WTSP") in Henning, Tennessee, filed a habeas corpus petition under 28 U.S.C. § 2254. (Docket Entry ("D.E.") 1). The Court issued an order on April 26, 2007 directing Respondent to file the state-court record and to respond to the petition. On September 4, 2007, Respondent filed an answer and the technical records for Daniel's trial, direct appeal and post-conviction proceedings, including the transcripts. (D.E. 18, 19). Despite being granted four extensions of time which have now expired, Daniel has not filed a traverse. On July 24, 2008, the Court notified Daniel that the determination of the habeas petition would proceed on the record currently before the Court.

I.   STATE COURT PROCEDURAL HISTORY AND UNDERLYING FACTS

     A.   Procedural History

Petitioner Donavan Daniel was indicted on two counts of premeditated murder, two counts of felony murder, one count of especially aggravated robbery, and one count of possession of marijuana with intent to sell or deliver in Weakley County Circuit Court. (Respondent's Addendum ("Add." 1, p. 1-3). Petitioner was a minor at the time of the offenses, but due to the serious nature of the crimes and Petitioner's age at the time of trial, the State provided notice of its intent to try Petitioner in Circuit Court. (Add. 1, p. 12) Petitioner filed a motion to suppress his statements to police. (Add. 1, p. 32). The motion to suppress was denied by Circuit Court Judge William Acree. (Add. 2, pp. 98-101). The State provided notice of its intent to seek a sentence of life without parole. (Add. 1, p. 33). Petitioner filed an ex parte motion seeking an expert to aid in mitigation during the sentencing hearing, and the court denied the motion. (Add. 2, pp. 102-107). After a jury trial, Daniel was found guilty as charged. (Add. 1, pp. 42-48). The trial court sentenced Daniel to a life sentence on the merged counts of premeditated murder, life in prison without the possibility of parole on the merged counts of felony murder, twenty years imprisonment for the especially aggravated robbery conviction and one year imprisonment for the possession of

marijuana with intent to resell, all to be served concurrently. (Add. 8, p. 2).

Daniel appealed and the Tennessee Court of Criminal Appeals affirmed his convictions and sentences. The Tennessee Supreme Court denied Petitioner's pro se application for permission to appeal. (Add. 8; Add. 10; Daniel v. State, No. W2000-00981-CCA-R3-CD, 2001 WL 1690196 (Tenn. Crim. App. Dec. 28, 2001), perm. app. denied (Tenn. June 3, 2002).

On April 23, 2003, Petitioner filed a pro se petition for post-conviction relief. (Add. 11, pp. 1-9). Counsel was appointed and filed an amended petition on July 31, 2003. (Add. 11, pp. 21-24). An evidentiary hearing was held and the post-conviction court denied relief in an order issued on Sept. 25, 2003. (Add. 13, pp. 20-24). The Tennessee Court of Criminal Appeals affirmed the denial of relief. (Add. 15; Daniel v. State, No. W2003-02511-CCA-R3-PC, 2004 WL 2159004 (Tenn. Crim. App. Sept. 27, 2004), perm. app. denied (Tenn. Jan. 24, 2005).

B.    Facts

Daniel's statements to law enforcement officers established the following sequence of events:

> On the afternoon of June 2, 1999, Daniel and two other young men visited the victim, Clarence Jones' home in Martin, Tennessee. Daniel and his friends smoked marijuana with Jones. After Daniel's two friends left, Jones and Daniel smoked more marijuana and Daniel drank a mixed drink. During this time, a man came to the home and bought marijuana from Jones. After he left, Daniel drank another mixed drink. Misty Schrems and a couple of

her friends also came over to buy marijuana from Jones.
Ms. Schrems and the other guests remained at the victim's
home with Daniel and Jones for a few hours. They all
smoked more marijuana. Several more people came to the
house and bought marijuana from Jones. After everyone but
Daniel and Jones had left, Shannon Parham and Natasa
James came to the house. By this time, Daniel was
"starting to feel crazy" and tried to "get with" one of
the girls. The two girls left after twenty or thirty
minutes.

Daniel and Jones continued to smoke marijuana and drink
alcoholic beverages until Jones' roommate, Tamakia
Thomas, came home. Shortly after Thomas arrived home,
Jones rolled another marijuana cigarette and went to his
room to "play some music." Daniel went to the kitchen and
picked up Jones' rifle from the counter. Daniel walked
into the hallway leading to Jones' bedroom. Daniel shot
and killed Jones, who was standing in his bedroom. Daniel
did not think that Jones saw him with the gun prior to
being shot. Neither Daniel nor Jones said anything before
Daniel shot Jones. The other victim, Tamakia Thomas, was
in the bathroom with the door shut when Daniel shot
Jones. Daniel turned around after shooting Jones and was
startled to find that Thomas had opened the bathroom door
and was standing just inside the bathroom. Daniel shot
and killed Thomas.

After killing Jones and Thomas, Daniel walked around for
a moment and tried to gather his thoughts. He started
looking for some money to "get out of town." Daniel took
money from Jones' pocket and Jones' dresser. He also took
a ring off of Jones' finger and the watch from his wrist.
At this point, someone began knocking on the front door.
Daniel put a sock on his hand and tried to escape out of
the window in Jones' room. The knocking stopped before
Daniel was able to get out the window, so he went out the
front door instead. Before leaving in Jones' car, Daniel
grabbed the murder weapon and a large bag of marijuana.
Daniel drove to Union City, where he "stashed" the murder
weapon in a dumpster. He also left Jones' car in the
parking lot of the Wal-Mart in Union City. A friend,
Mitchell Avent, then drove the defendant to a motel, also
in Union City. Mr. Avent went inside and paid for the
room with money Daniel had taken from Jones. Daniel spent
the night at the motel and called Mr. Avent to pick him
up around noon the next day. When Mr. Avent returned to
the motel to pick up Daniel, Daniel gave Mr. Avent a

Rolex watch belonging to Jones, which Mr. Avent later gave to the police. Mr. Avent drove Daniel to his home in Martin, and Daniel "went on about [his] day like nothing had happened."

Daniel returned to Mr. Avent's house later that evening and asked Mr. Avent to provide an alibi for him during the time that the murders were committed. Mr. Avent refused and asked Daniel not to mention his name to the police.

From his conversations with Daniel, Mr. Avent got the impression that Daniel's motive for killing Jones and Thomas was Jones' money. Mr. Avent clarified that Daniel never specifically told Mr. Avent why he had murdered Jones and Thomas, but did tell Mr. Avent that he knew that Jones had some money before he killed him. Mr. Avent also testified that Daniel appeared to have been smoking marijuana on the night of the murders because his eyes were red. Mr. Avent did not, however, indicate that Daniel was otherwise impaired. He stated that Daniel appeared to know what he was doing.

(Daniel, 2001 WL 1690196 at *2-*4)

Prosecution witnesses Natasa James, Shannon Parham, and Misty Schrems testified at trial as follows:

Natasa James also testified for the State. Ms. James visited the home of Jones and Thomas on the night of the murders to get money that Jones owed her for a washer and dryer that she had recently sold to Jones. Her roommate, Shannon Parham, was with her, and they arrived at the home between eight and eighty-thirty p.m. The defendant and Jones were alone in the home. When Ms. James walked in the door, the defendant was standing and holding a rifle, which was pointed in her direction. Jones told the defendant to put the gun down. The defendant lowered the gun but continued to hold the gun while the two women were there. The group sat in the living room and at some point the defendant asked Ms. James if he could touch her leg. Shortly thereafter, the two women left.

Ms. Parham also testified at the defendant's trial. Ms. Parham corroborated that the defendant had a rifle in his possession the entire time she and Ms. James were there. Ms. Parham did not notice any unusual behavior by the

defendant. Based on her observation, the defendant and Jones were not in any type of disagreement.

Misty Schrems testified that she also visited the victims' home the night of the murders. Ms. Schrems, along with two friends, arrived at about five or five-thirty p.m. and stayed until about eight or eight-thirty p.m. The defendant and Jones were the only people there during that time. Ms. Schrems said that everyone was drinking beer and smoking marijuana while she was there. Jones had a large shopping bag in the kitchen, which was full of marijuana. She said that it was in plain view for the defendant to see many times while she was there. Ms. Schrems returned to the victims' home around eleven-thirty p.m. the same night. Jones' car was not in the driveway, and no one answered the door. Ms. Schrems returned home but continued to telephone the victims' home throughout the next day. Unable to reach the victims by telephone, Ms. Schrems returned to the victims' home around six-thirty p.m. Finding the door unlocked, she went inside to leave a note. The stereo was on and very loud. Ms. Schrems tried to turn down the stereo in the living room but realized that it was not on. She went to the bedroom to turn off the other stereo. That was when she saw that the room had been torn apart and found Jones' body lying on the floor. Ms. Schrems became very upset and ran outside the home screaming that Jones was dead. While inside the house, Ms. Schrems noticed that there was some marijuana on top of the dryer. Afraid that Ms. Thomas would get in trouble if the police found it, she re-entered the home and took the marijuana to the bathroom, intending to flush it down the toilet. When she walked into the bathroom, however, she discovered Ms. Thomas' body lying in the bathtub. Ms. Schrems left the marijuana in the doorway of the bathroom and ran back out of the home screaming that both Jones and Thomas were dead. She screamed for the neighbors to call the police but jumped in the car and left before the police arrived. Ms. Schrems said that she panicked and drove to the home of Thomas' family to tell them that she was dead. Ms. Schrems then accompanied Thomas' family members back to the victims' home and talked with the police.

(Daniel, 2001 WL 1690196 at *3-*4)

Chad Johnson, a forensic scientist for the Tennessee Bureau of

Investigation, examined the evidence at the scene of the murders

and the evidence collected from the defendant's residence. Mr. Johnson testified that:

> the body of Clarence Jones was found in the bedroom and that the body of Tamakia Thomas was found in the bathtub. Photographs of the locations of the bodies were introduced as evidence. Also introduced as evidence were Jones' ring, a large bag of marijuana, and a shirt with blood on it, all found in a dumpster near the defendant's home. Mr. Johnson also testified that he found money in the sole of one of the defendant's tennis shoes.

(<u>Daniel</u>, 2001 WL 1690196 at *5)

A forensic pathologist, Dr. Gunther, performed autopsy examinations of both victims and testified that:

> both victims died from a single gunshot wound to the head. Mr. Jones was shot in the back left side of his head above the ear. Ms. Thomas was shot in the forehead from an estimated distance of anywhere between a half a foot and two feet. Dr. Gunther testified that the gunshots to both victims likely caused immediate death.

(<u>Id.</u>)

## II. <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

In this federal habeas petition, Daniel raises the following issues:

> Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment:
>
> 1. by failing to adequately brief or argue that Petitioner did not knowingly waive his constitutional rights prior to confessing to the murders for which he was convicted;
>
> 2. by failing to challenge the legality of the detention during which he made statements to the police;
>
> 3. by failing to obtain a mitigation expert at sentencing;

4.   by failing to attach an affidavit from the proposed expert in order to make the required showing of a particularized need; and

5.   by failing to object to the jury instructions that were given during the penalty phase of Petitioner's sentencing hearing which relieved the State of its burden of proof.

## III. <u>RESPONDENT'S ANSWER</u>

Respondent contends that issue 5 is procedurally defaulted because Petitioner failed to present it to the state courts. Respondent contends that the remaining issues of the petition, which are exhausted, were correctly decided by the state courts.

## IV. <u>LEGAL STANDARDS APPLICABLE TO HABEAS PETITIONS</u>

### A.   <u>Waiver and Procedural Default</u>

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

   (A)   the applicant has exhausted the remedies available in the courts of the State;   or

   (B)   (i)   there is an absence of available State corrective process;   or

      (ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

(2)   An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254.   <u>See, e.g.,</u>

Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); Preiser v. Rodriquez, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." Gray v. Netherland, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" Id. at 163 (quoting Picard, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id. When a

petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pillette v. Foltz</u>, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. <u>Pillette</u>, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982); <u>see also</u> <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995)(per curiam)("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. <u>Coleman v. Thompson</u>, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87-88 (1977). However,

the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. <u>Smith v. Digmon</u>, 434 U.S. 332 (1978) (per curiam); <u>see also</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. <u>Coleman</u>, 501 U.S. at 752-53; <u>Teague v. Lane</u>, 489 U.S. 288, 297-99 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. at 87-88; <u>Rust</u>, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Wainwright v. Sykes</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that

"'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)(quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

B. <u>Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision with respect to each issue was based on an unreasonable determination of

the facts in light of the evidence presented in the state proceeding.

   1.   § 2254(d)(1)

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[1]   In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning.   A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .   A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.   Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[2]   The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining

---

[1]   By contrast, there is little caselaw concerning the standards for applying § 2254(d)(2).

[2]   The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." Cone, 535 U.S. at 694; see also Andrade, 538 U.S. at 75; Williams, 529 U.S. at 409.[3] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410.[4] "[A] federal habeas court making the

---

[3]    Although the Supreme Court in Williams recognized, in dicta, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," id. at 408. The Williams Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," id. at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. See Williams v. Coyle, 260 F.3d 684, 699-700 (6th Cir. 2001), cert. denied, 536 U.S. 947 (2002).

[4]    See also Andrade, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam)(holding that the
(continued...)

'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[5]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000).  As the Sixth Circuit explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1999)(citing 17A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4261.1 (2d ed. Supp. 1998)); <u>see also</u> <u>Harris</u>, 212 F.3d at 944 ("It

---

[4]        (...continued)
lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

[5]        <u>See also</u> <u>Brown v. Payton</u>, 544 U.S. 133, 147 (2005)("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'")(citations omitted).

was error for the district court to rely on authority other than
that of the Supreme Court of the United States in its analysis
under § 2254(d)."). Finally, in determining whether a rule is
"clearly established," a habeas court is entitled to rely on "the
holdings, as opposed to the dicta, of [the Supreme] Court's
decisions as of the time of the relevant state-court decision."
<u>Williams</u>, 529 U.S. at 412.

    2.   <u>§ 2254(d)(2)</u>

    Few cases address the standards for applying § 2254(d)(2),
which permits federal courts to grant writs of habeas corpus where
the state court's adjudication of a petitioner's claim "resulted in
a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court
proceeding." In a decision applying this standard, the Supreme
Court observed that § 2254(d)(2) must be read in conjunction with
28 U.S.C. § 2254(e)(1), which provides that a state court's factual
determinations are presumed to be correct unless rebutted by clear
and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240
(2005).[6] It appears that the Supreme Court has, in effect,
incorporated the standards applicable to the "unreasonable
application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 546 U.S. 333,
338-39 (2006)("Reasonable minds reviewing the record might disagree

---

    [6]   <u>But cf.</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006)(recognizing
that it is unsettled whether there are some factual disputes where §
2254(e)(1) is inapplicable).

about the prosecutor's credibility, but on habeas review that does
not suffice to supersede the trial court's credibility
determination."). That is consistent with the approach taken by
the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under
> § 2254(d)(2) simply because the court disagrees with a
> state trial court's factual determination. Such relief
> may only be granted if the state court's factual
> determination was "objectively unreasonable" in light of
> the evidence presented in the state court proceedings.
> Moreover . . . , the state court's factual determinations
> are entitled to a presumption of correctness, which is
> rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002)
(citing 28 U.S.C. § 2254(e)(1));[7] see also Stanley v. Lazaroff, 01-
4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v.
Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21,
2003)("Though the Supreme Court has not yet interpreted the
'unreasonable determination' clause of § 2254(d)(2), based upon the
reasoning in Williams, it appears that a court may grant the writ
if the state court's decision is based on an objectively
unreasonable determination of the facts in light of the evidence
presented during the state court proceeding.")(citing Torres v.
Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

V.    ANALYSIS OF PETITIONER'S CLAIMS

    A.    Issue 5: Erroneous Jury Instructions

---

[7]    See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981)(applying
presumption of correctness to factual determinations of state appellate
courts).

Issue 5, Daniel's contention that counsel's failure to object to erroneous jury instructions prejudiced his due process rights has never been presented to or substantively addressed by the Tennessee Court of Criminal Appeals. Further presentation of this claim in state court is barred by Tennessee's post-conviction petition statute of limitations and by Tennessee's one-petition rule. <u>See</u> Tenn. Code Ann. §§ 40-30-202(a),(c)(1997). Thus, issue 5 has been exhausted through Daniel's procedural default, and he has no avenue remaining for presentation of his claims given the state statute of limitations on state post-conviction relief.

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by his failure to file within the Tennessee statute of limitations on post-conviction relief. <u>Hannah v. Conley</u>, 49 F.3d 1193, 1194-95 (6th Cir. 1995)(construing first state statute). The Court construed the first post-conviction statute of limitations and stated that "the language of Tenn. Code Ann. § 40-30-102 is mandatory." <u>Id.</u> at 1195. This claim is exhausted by this procedural default. Daniel cannot, therefore, obtain habeas relief in this Court. <u>Crank v. Duckworth</u>, 969 F.2d 363, 365-66 (7th Cir. 1992)(holding on appeal after remand that attack on enhancing state sentence procedurally barred). The procedural default operates as a complete and independent procedural bar to federal habeas review of the claims presented. This Court must honor the state court's

invocation of its procedural bar. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991).

B. <u>Ineffective Assistance of Counsel</u>

<u>Applicable Legal Standards</u>

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time. Because of the
difficulties inherent in making the evaluation, a court
must indulge a strong presumption that counsel's conduct
falls within the wide range of reasonable professional
assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged
action "might be considered sound trial strategy."

Id. at 689 (citation omitted); see also Coe v. Bell, 161 F.3d 320,

342 (6th Cir. 1999)("The specifics of what Coe claims an effective

lawyer would have done for him are too voluminous to detail here.

They also largely miss the point: just as (or more) important as

what the lawyer missed is what he did not miss. That is, we focus

on the adequacy or inadequacy of counsel's actual performance, not

counsel's (hindsight) potential for improvement."); Adams v. Jago,

703 F.2d 978, 981 (6th Cir. 1983)("a defendant 'has not been denied

effective assistance by erroneous tactical decisions if, at the

time, the decisions would have seemed reasonable to the competent

trial attorney'")(citations omitted).

A prisoner attacking his conviction bears the burden of

establishing that he suffered some prejudice from his attorney's

ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir.

1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992).

"[A] court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the

defendant." Strickland, 466 U.S. at 697. If a reviewing court

finds a lack of prejudice, it need not determine whether, in fact,

counsel's performance was deficient. Id. at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993)(citing United States v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369.


## Application

Respondent contends that the Tennessee Court of Criminal Appeals relied on Strickland, the relevant Supreme Court precedent for analyzing claims of ineffective assistance, accurately summarized the proof on each issue, and made a reasonable

determination of the facts that is entitled to a presumption of correctness.

> <u>Issues 1 and 2: Failure to recognize and challenge the unlawful detention of Petitioner which resulted in his unknowing waiver of rights prior and incriminating statements</u>

Daniel contended during the post-conviction proceedings that trial counsel failed to realize that Daniel was unlawfully detained before he confessed and that the unlawful detention led to his confession. At the post-conviction hearing, Daniel's trial attorney Joe Atnip testified that he filed a motion to suppress Petitioner's statements to the police as involuntary because Petitioner was tired after two interviews by the police and the statement was made after the conclusion of the second interview when police accompanied him to his mother's house at a late hour, after a long and arduous day. (Add. 12, pp. 14-20). Counsel testified that he did not "at the time feel that the confession he made was made after an unlawful detention" but was made "after a lawful detention." (Add. 12, p. 22).

<u>Testimony from Suppression Hearing</u>

The Court has reviewed the testimony of witnesses at the pre-trial suppression hearing. (Add. 2, pp. 1-115). The summary of that testimony by the Tennessee Court of Criminal Appeals during Daniel's direct appeal is accurate and is as follows:

In the present case, three police officers, Daniel, and Daniel's mother testified at the pre-trial suppression hearing. Based upon the testimony, the following facts were not disputed. Daniel's mother brought him to the police station for questioning between eight and ten o'clock p.m. the day after the murders were committed. Daniel was not a suspect at this time. However, the police had received information indicating that Daniel was the last person to see the victims alive. Daniel did not make any incriminating statements during the first interview with police and returned home with his mother. After verifying that Daniel had lied about what time he arrived home the night of the murders, the police asked Daniel's mother to bring him back to the station. Daniel and his mother returned to the station. At around midnight, Daniel gave another written statement, which was not incriminating. The interviewing officer did not Mirandize Daniel prior to him making the statement. Around one o'clock a.m., Daniel was Mirandized and questioned again by two other officers. This questioning lasted until about two-thirty a.m., when Daniel's mother asked if they could go home and get some rest. The officers indicated that Daniel was free to go but requested that they be allowed to search his residence. Daniel's mother gave her permission for the search, and the officers followed her and Daniel home.

At Daniel's residence, the officers did not permit Daniel to enter his home because of the possibility that he might contaminate the scene. At least one officer remained outside with Daniel at all times. He was not permitted to lie down in his mother's car to rest because the officers were afraid that he might try to leave. Therefore, Daniel alternately sat and laid down on the sidewalk and the hood of his mother's car. At some point before dawn, the officers decided to call the crime scene van to conduct a more thorough search for evidence. While they waited for the van to arrive, one of the officers searched a nearby dumpster and found a bag of marijuana and some clothing inside. The officer immediately confronted Daniel with what he had found. At first, Daniel denied any knowledge about the items that were found but later admitted, after talking with his mother, that he had placed the marijuana in the dumpster. Daniel said that the victim, Clarence Jones, had "fronted him" the marijuana but continued to deny any involvement in the murders.

While they waited for the crime scene van to arrive, Daniel and an officer, Captain Moore, discussed the seriousness of the crimes and the possible punishments. Captain Moore advised Daniel that it would be in his best interest to cooperate with the investigating officers. After the crime scene van arrived, Daniel's arms were tested for gun residue and his shoes were taken to test what appeared to be blood splatter on them. Once the officers were apprized of the blood splatter evidence and identified a ring, found in the bag of marijuana, belonging to the victim, Daniel was handcuffed and told that he was being placed under arrest for possession of marijuana. At this point, Daniel confessed to the murders. Daniel's mother was notified that Daniel was being taken into custody, and a juvenile officer was called to the scene. At around eight o'clock a.m., Daniel was transported to the police station. Once there, Daniel was given Miranda warnings again and signed a written waiver before giving a written confession.

Daniel's allegations concerning the promises of leniency were disputed at the suppression hearing. Captain Moore was asked if he told Daniel that he would get the death penalty if he did not cooperate with police. Captain Moore responded that he did not recall ever mentioning the death penalty to Daniel. He admitted, however, to advising Daniel that "this was a crime that could land him in jail for a lot of years" and that it would be to his benefit to cooperate with the police. Captain Moore further admitted that during the discussion with Daniel concerning possible punishments, he was not aware that the death penalty was not available as a punishment for juvenile defendants. Captain Moore said that the juvenile officer advised him of such after his conversation with Daniel but continued to maintain that the death penalty was never discussed with Daniel.

Daniel and his mother both testified and related their version of how the events transpired. Daniel said he had slept until noon the day he was questioned but alleged that he was still very tired during the late-night/early-morning questioning. He also testified that Captain Moore told him if he cooperated by confessing to the crimes, he might not get the death penalty. Daniel said that his conversation occurred in his mother's bedroom after Captain Moore accompanied him to the bathroom, and that no one else was present at the time. Daniel further alleged that after Captain Moore placed handcuffs on him

and placed him in the back of a police car, he told
Daniel that it was his last change to talk.  He said that
Captain Moore than asked if he wanted to take "a little
walk to talk."   Daniel testified that he believed the
Captain to be saying that it was his last chance to avoid
the death penalty.  Daniel claimed that he confessed to
the murders because of his physical exhaustion and fear
of the death penalty.

Daniel's mother verified that Daniel was questioned off
and on from sometime around nine o'clock p.m., until the
next morning when he was arrested and taken into police
custody.  She testified that Daniel was very tired and
that she requested several times that he be allowed to
sleep on the couch.  She said that the officers would not
let Daniel lie down in her car even though she had the
keys and there were two cars parked behind it.  She did
not hear Captain Moore mention the death penalty.

Daniel, 2001 WL 1690196 at *6-*8.

### Testimony at the Post-Conviction Hearing

The Tennessee Court of Criminal Appeals summarized the
testimony presented during Daniel's post-conviction hearing as
follows:

Daniel's trial counsel testified that he only raised the
issue of the voluntariness of Daniel's confession in the
motion to suppress because, in his opinion, Daniel's
detention before he confessed was lawful.  Daniel did not
make any incriminating statements during his first two
interviews, and his confession was made after the police
arrested Daniel for possession of a controlled substance.
Counsel conceded that Daniel was in custodial detention
during the consensual search of this mother's house but
said that Daniel voluntarily approached one of the police
officers after he was arrested and told him that he had
something to say.  Counsel agreed that it might have been
prudent to include the issue of an unlawful detention
within his motion to suppress.

Daniel, 2004 WL 2159004 at *3.

After reviewing the post-conviction testimony the Tennessee Court of Criminal Appeals stated:

Daniel argues that his trial counsel was deficient for not raising the legality of Daniel's detention in his motion to suppress and that, had he done so, Daniel's subsequent confession would have been inadmissible as the fruit of that unlawful seizure. The post-conviction court found that even assuming *arguendo* that Daniel's initial detention was unlawful, Daniel's confession would not have been suppressed if the issue had been raised.

In providing effective assistance, "[d]efense counsel 'must conduct appropriate investigations, both factual and legal,' and 'must assert them in a timely manner.'" State v. Nichols, 90 S.W. 3d 576, 587 (Tenn. 2002)(quoting Baxter [v. Rose], 523 S.W. 2d [930] at 932, 935[Tenn. 1975]). If defense counsel has made adequate investigation, we may not second guess counsel's strategic or tactical choices. Hellard [v. State], 629 S.W.2d [4,] 9 [(Tenn. 1982]. Daniel's counsel testified that he discussed Daniel's confession with him and could not conclude under the facts presented to him that the confession was made as a result of an unlawful detention. He chose, therefore, to challenge the voluntariness of Daniel's confession in his motion to suppress. The fact that this defense ultimately proved unsuccessful on appeal does not by itself support a finding of deficiency in performance. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997).

Based on our review, we cannot conclude that the evidence preponderates against the post-conviction court's finding that Daniel would not have been successful had he raised the issue of an unlawful detention. Daniel argues that his initial questioning represented an unlawful seizure because he was not free to leave the police station and could not refuse to answer the officers' questions. Not every interaction between a police officer and a citizen, however, rises to the level of a seizure. See Terry v. Ohio, 392 U.S. 1 (1968). Under appropriate circumstances and in an appropriate manner, a police officer may question a person for the purposes of investigation even though the officer does not at that time have probable cause to make an arrest. Id. at 19 n. 16. "Only when the officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen may

we conclude that a 'seizure' has occurred." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000).

> The police asked Daniel to come to the police station for questioning when they learned that he was the last person to see the victims alive. Daniel arrived at the police station for the two questioning sessions on his own volition and accompanied by his mother. Upon his mother's request, Daniel was permitted to leave the station after he completed his first written statement. Daniel was asked to return to the station after certain discrepancies in his first statement were detected. After he gave his second written statement, Daniel was read his *Miranda* rights and then questioned again. On appeal, this Court concluded that the police officers complied with the *Miranda* requirements and that Daniel knowingly waived those rights. Daniel, 2001 WL 1690196 at *9.

> Daniel does not dispute the consensual nature of the ensuing search. After he admitted that the marijuana found in the dumpster was his, Daniel was placed under arrest. Without any prompting from the police, Daniel then confessed to the other offenses. The evidence does not preponderate against the post-conviction court's findings that Daniel failed to establish that he was prejudiced by his counsel's decision not to question the legality of his detention during the consensual search of this mother's house. Daniel is not entitled to relief on this issue.

Daniel, 2004 WL 2159004 at *5-6.

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on Strickland, the relevant Supreme Court precedent pertaining to claims of ineffective assistance. See Daniel, 2004 WL 2159004 at *5. The Court of Criminal Appeals applied that clearly established precedent correctly and in an objectively reasonable manner.

27

Based upon this Court's review of the transcript of testimony during the post-conviction hearing, including trial counsel's testimony, (Add. 12, pp. 8-36), the decision of the Tennessee Court of Criminal Appeals also did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. Id., § 2254(e)(1). Daniel presents no argument which overcomes that presumption. The state court determined that counsel was not deficient. This Court agrees.

### Issues 3 and 4: Failure to Obtain a Mitigation Expert and Attach an Affidavit Establishing a Particularized Need

Daniel contended during post-conviction proceedings that counsel's performance was deficient because he failed to demonstrate a particularized need for expert services and timely present the affidavit of the proposed expert to the trial court.

### Testimony from Post-Conviction Hearing

Daniel's counsel said that he contacted Dr. Frank Einstein as a potential expert witness on December 2, 1999. Counsel believed that he discussed his own personal observations about Daniel and his background with Dr. Einstein and sent Dr. Einstein a copy of the mental evaluation performed by the West Tennessee Mental Health Institute. Dr. Einstein provided an affidavit outlining his qualifications, the scope of his services,

and his fees.  Dr. Einstein stated in the affidavit that
one of the goals of his engagement would be to identify
any mitigating factors that could be presented to the
jury during Daniel's sentencing hearing.  Dr. Einstein's
affidavit, however, was not filed with the court until
September 6, 2000.

Counsel admitted that he did not have Dr. Einstein's
affidavit at the time the ex parte hearing on Daniel's
motion for expert services was held.  He stated that he
had tried to identify a particularized need for Dr.
Einstein's services prior to the ex parte hearing but was
unable to do so.  Instead, counsel told the trial court
that Dr. Einstein's services were necessary to make sure
that he did not miss anything that might be useful as a
mitigating factor during sentencing.  In any event,
counsel explained that Dr. Einstein's affidavit did not
address the issue of a particularized need.

Daniel, 2004 WL 2159004 at *4.

The Tennessee Court of Criminal Appeals reviewed the post-

conviction testimony, (Add. 12, pp. 36-52) stating:

Daniel argues that his counsel provided ineffective
assistance when he failed to support his motion for
expert services with Dr. Einstein's affidavit.  Daniel
contends that it is reasonable to conclude that the trial
court would have granted Daniel's motion if counsel had
presented Dr. Einstein's affidavit.  The trial court,
however, denied Daniel's motion because it did not
believe that it had the authority to authorize a
mitigation expert at the state's expense in a non-capital
case.  Under the trial court's analysis, Dr. Einstein's
affidavit would not have been helpful one way or the
other.

Daniel's counsel said that he was aware prior to trial
that Daniel had used alcohol and drugs since he was about
fifteen years old and that Daniel's mother and
grandmother had been diagnosed with bipolar disorder.
Counsel states, however, that the mental evaluation
performed by the West Tennessee Mental Health Institute
did not show that Daniel had any disposition toward
bipolar disorder.  Counsel said that he was able to place
before the jury the fact the Daniel had been taking drugs
and drinking alcohol all day prior to the commission of

the offenses. Although Daniel pointed out that he was a high school drop out, he does not say how that factor demonstrates a particularized need for a mitigation expert. Daniel completed his G.E.D. and was scheduled to enter college in the fall. Based on the facts surrounding the case, counsel testified that he did not know of a particularized need that would justify the employment of an expert.

Daniel did not offer any evidence at the post-conviction hearing in support of a particularized need for an expert witness, other than Dr. Einstein's affidavit. This Court has already concluded on appeal that Dr. Einstein's affidavit does not support Daniel's particularized need for an expert witness under the <u>Barnett</u> requirements. <u>Daniel</u>, 2001 WL 1690196 at *11. Daniel, therefore, failed to set forth any proof of prejudice assuming his counsel had rendered ineffective assistance with regard to his request for an expert. Daniel is not entitled to relief on this issue.

<u>Daniel</u>, 2004 WL 2159004 at *6-7.

In this proceeding, Daniel argues that counsel could not have demonstrated a particularized need for the expert without the affidavit. Daniel fails to articulate the particularized need in the petition. Daniel ignores the finding by the state courts that the affidavit did not support a particularized need under the <u>Barnett</u> requirements. Daniel's conclusory argument is not sufficient to demonstrate either deficient performance or an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). He has not satisfied his burden of demonstrating that he is entitled to relief on this issue.

Daniel has presented no argument demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary

to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). He has not satisfied his burden of demonstrating that he is entitled to relief.

Petitioner's claims are either procedurally defaulted or devoid of substantive merit and disposition of this petition without an evidentiary hearing is proper. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. The petition is DENIED and DISMISSED.

VI. <u>Appellate Issues</u>

The Court must also determine whether to issue a certificate of appealability ("COA"). Twenty-eight U.S.C. § 2253(a) requires a district court to evaluate the appealability of its decision dismissing a § 2254 habeas petition and to issue a certificate of appealability ("COA") only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio Adult Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997)(district judges may issue certificates of appealability). No § 2254 petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard

announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" <u>Slack</u>, 529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in <u>Slack</u> would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>, 463 U.S. at 893). Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also</u> <u>id.</u> at 342 (cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[8]

   In this case, the issues presented by Petitioner's petition are either procedurally defaulted or without merit for the reasons previously stated. Because he cannot present a question of some substance about which reasonable jurists could differ, the Court DENIES a certificate of appealability.

   The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2254 petitions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal in forma pauperis in a § 2254 case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, Petitioner must seek permission from the district court under Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, Petitioner must file his motion to proceed in forma

---

   [8] The Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

33

pauperis in the appellate court. <u>See</u> Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal <u>in forma pauperis</u> is DENIED. If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed <u>in forma pauperis</u> and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 13th day of August, 2008.


/s/ JON PHIPPS MCCALLA
UNITED STATES DISTRICT JUDGE

34